BUILDING INDUSTRY ASSOCIATION OF SUPERIOR CALIFORNIA, et al., Plaintiffs,

v.

Bruce BABBITT, et al., Defendants,

Environmental Defense Center and Butte Environmental Council, Defendant–Intervenors.

Civil Action No. 95–0726(PLF).

United States District Court, District of Columbia.

July 25, 1997.

894

Lawrence R. Lilbesman, Linowes & Blocher, L.L.P., Silver Spring, MD, for Plaintiffs.

Lyn Jacobs, Dept. of Justice, Environmental Div., Washington, DC, for Defendants.

Anne Spielberg, Harmon, Curran & Spielberg, Washington, DC, Marc Chytilo, Environmental Defense Center, Santa Barbara, CA, Neil Levine, University of Denver, Denver, CO, Robin L. Rivett, Mark T. Gallagher, Sacramento, CA, for Defendant/Intervenors.

## OPINION
PAUL L. FRIEDMAN, District Judge.

### I. BACKGROUND

"Fairy shrimp" are tiny crustaceans found primarily, although not exclusively, in California's Central Valley region. Named for their delicate elongated bodies and wing-like thrashing legs, fairy shrimp are endemic to "vernal pools," sometimes known as seasonal wetlands, which are seasonally wet, isolated water bodies that pond in the winter and spring and evaporate during the summer. Fairy shrimp, the collective term for several similar shrimp species, constitute an important link in the vernal pool ecosystem, providing food for other animals and maintaining various aspects of the vernal pool ecological balance.[1] As a general matter, vernal pool habitat stretches from southern . Oregon down the west coast into Baja California, although fairy shrimp are not found throughout this region. Final Rule, 59 Fed.Reg. at 48136. Since vernal pools occur throughout the farmlands of the Central Valley as well as in other areas of heavy agricultural and urban economic development, much of the fairy shrimp's habitat has been destroyed over the years, and it continues to disappear at a rate of about two to three percent per year. *Id.* at 48137.

The fate of these little creatures and their hotly contested habitat drives the instant case. On September 19, 1994, the Fish and Wildlife Service ("FWS") of the United States Department of the Interior exercised its authority under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*, to list as endangered three different species of fairy shrimp—the Conservancy fairy shrimp (*Branchinecta conservatio*), the longhorn fairy shrimp (*Branchinect logiantenna*) and the vernal pool tadpole shrimp (*Lepidurus packardi*)—and to list as threatened one species of fairy shrimp—the vernal pool fairy shrimp (*Branchinecta lynchi*). Final Rule, 59 Fed.Reg. 48136 (Sept. 19, 1994).[2] The

---

1. Final Rule: Determination of Endangered Status for the Conservancy Fairy Shrimp, Longhorn Fairy Shrimp, and the Vernal Pool Tadpole Shrimp; and Threatened Status for the Vernal Pool Fairy Shrimp ("Final Rule"), 59 Fed.Reg. 48136, 48137 (Sept. 19, 1994), Administrative Record ("A.R.") at 186.

2. In its Final Rule, the FWS also withdrew the California linderiella (*Linderiella occidentalis*), a species of fairy shrimp that initially had been proposed for listing in the Proposed Rule. Final Rule, 59 Fed.Reg. at 48136.

FWS based its listing decision on its findings that fairy shrimp habitat has been and continues to be destroyed, that a number of specific planned development projects would further eliminate known vernal pool complexes, and that fairy shrimp are scarce within their remaining habitat. *Id.* at 48147–51.

Plaintiffs challenge the listing of these four species of fairy shrimp, arguing that the listings violate the ESA, the Administrative Procedure Act, 5 U.S.C. §§ 501 *et seq.*, and the Fifth Amendment, the Tenth Amendment and the Commerce Clause of the United States Constitution.[3] Defendants and defendant-intervenors maintain that the listings are well supported by law and the best available science, and that in any event plaintiffs lack standing to challenge the listings because their interests do not fall within the zone of interests that Congress intended to protect with the ESA. The case is before the Court on cross-motions for summary judgment.

## II. STATUTORY FRAMEWORK

An "endangered species" is "any species which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A "threatened species" is "any species that is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). "To the maximum extent practicable," within 90 days after receiving a petition of an interested person to list a species, the Secretary of the Department of the Interior shall make a finding whether the listing may be warrant-

ed. 16 U.S.C. § 1533(b)(3)(A). If the listing may be warranted, within 12 months of receiving the petition the Secretary shall make a determination either that the petitioned action is not warranted, warranted, or warranted but precluded. 16 U.S.C. § 1533(b)(3)(B).[4] In so doing, the Secretary, through the FWS,

> shall … determine whether any species is an endangered species or a threatened species because of any of the following factors: (A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1). The Secretary shall make such determinations "solely on the basis of the best scientific and commercial data available...." 16 U.S.C. § 1533(b)(1)(A).

On November 19, 1990, Roxanne Bittman petitioned the FWS to list the Conservancy fairy shrimp, the longhorn fairy shrimp, the vernal pool fairy shrimp, and the California linderiella as endangered species. On April 28, 1991, Dee Warenycia petitioned the FWS to list the vernal pool tadpole shrimp as endangered. The FWS found that the petitions "may be warranted," 56 Fed.Reg. 426968 (Aug. 30, 1991), and published a Proposed Rule proposing to list the five species as endangered. 57 Fed.Reg. 19856 (May 8, 1992), A.R. at 480. An initial public comment

---

**3.** Plaintiffs are the Building Industry Association of Superior California ("BIA"), a nonprofit corporation representing approximately 625 businesses in the California construction industry and their employees; Marvin L. Oates, a real estate developer from Sacramento, California and a member of the BIA; Sacramento County, California; the Sacramento Metropolitan Chamber of Commerce; and the Rescue Union School District, California. Defendants are the United States Department of the Interior; Bruce Babbitt, Secretary of the Interior; the Fish and Wildlife Service; and Molly Beattie, Director of the FWS. Secretary Babbitt and Director Beattie are sued in their official capacities only.

 Intervening on behalf of defendants are the Environmental Defense Center and the Butte Environmental Council. The following organizations and governmental entities jointly filed an

amicus brief in support of plaintiffs: the Pacific Legal Foundation; the California Farm Bureau Federation; the California Cattlemen's Association; El Dorado County, California; and Placer County, California.

**4.** The Secretary may determine that an action is "warranted but precluded" where "the immediate proposal and timely promulgation of a final regulation implementing the petitioned action ... is precluded by pending proposals to determine whether any species is an endangered species or a threatened species" and "expeditious progress is being made to add qualified species to either of the lists published under subsection (c) of this section and to remove from such lists species for which the protections of this chapter are no longer necessary." 16 U.S.C. § 1533(b)(3)(B)(iii).

period lasted from May 8 through July 7, 1992, and a public hearing was held on August 31, 1992. The public comment period was reopened and extended until September 18, 1992. 57 Fed.Reg. 36380 (Aug. 13, 1992). On September 18, 1992, Representative Vic Fazio organized a public meeting in Red Bluff, California, which representatives of the FWS also attended. By the end of the public notice and comment period, the FWS had received 117 comments from public and private parties including, *inter alia,* the California Department of Parks and Recreation, the California Department of Fish and Game, and 41 private parties, all supporting the listing; it received comments from 34 private parties (including Sugnet and Associates, a consultant retained by plaintiff BIA), and two Congresspersons opposing the listing. 59 Fed.Reg. at 48139.

On February 9, 1994, conservation groups brought suit to compel the Secretary to list the fairy shrimp species as endangered. *Environmental Defense Center v. Babbitt,* Case No. 94–0788, Complaint (N.D.Cal. Feb. 9, 1994), A.R. at 19. In compliance with an agreement reached in settlement of that suit, the FWS published its Final Rule on September 19, 1994. *See* A.R. at 185. The FWS determined that three fairy shrimp species were endangered—the Conservancy fairy shrimp, the longhorn fairy shrimp and the vernal pool tadpole shrimp—and that one species, the vernal pool fairy shrimp, was threatened. It based its determination primarily on the present and threatened destruction, modification and curtailment of the fairy shrimp's habitat and range, the inadequacy of existing regulatory mechanisms, and other natural and man-made factors. 59 Fed.Reg. at 48147–50; *see* 16 U.S.C. § 1533(a)(1).

### III. STANDARD OF REVIEW

Judicial review of agency decisions under the ESA is governed by Section 706 of the APA. 5 U.S.C. § 706; *see City of Las Vegas v. Lujan,* 891 F.2d 927, 932 (D.C.Cir.1989). Agency actions may be set aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law." 5 U.S.C. § 706(2)(A). The Supreme Court has described the principles governing review as follows:

> The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choices made.... The reviewing court ... may not supply a reasoned basis for the agency's action that the agency itself has not given. [The court] will, however, uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983) (internal quotations and citations omitted). Review is based on the entire administrative record. *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); *see San Luis Obispo Mothers For Peace v. Nuclear Regulatory Commission,* 751 F.2d 1287, 1325–26 (D.C.Cir.1984).[5] Although the Court may not substitute its judgment for that of the agency, *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 1861–62, 104 L.Ed.2d 377 (1989), the Court's review must nevertheless be "searching and careful." *Id.*

In this case, much of the dispute revolves around the defendants' scientific conclusions about the state of the fairy shrimp species. The Supreme Court has made clear that under such circumstances where a determination "requires a high level of technical expertise [a court] must defer to the informed discretion of the responsible federal agencies." *Marsh v. Oregon Natural Resources Council,* 490 U.S. at 377, 109 S.Ct. at 1861; see *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 103, 103 S.Ct. 2246, 2255, 76 L.Ed.2d 437 (1983) ("When examining this kind of scientific determination ... a review-

---

**5.** By Memorandum Opinion and Order of October 30, 1995, the Court granted in part plaintiffs' motion to supplement the administrative record.

ing court must generally be at its most deferential."). In the same vein, "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh v. Oregon Natural Resources Council,* 490 U.S. at 378, 109 S.Ct. at 1861.

## IV. PLAINTIFFS' STANDING

Defendants and defendant-intervenors argue that plaintiffs lack Article III standing because they have failed to articulate injury in fact. Defendant-intervenors also argue that plaintiffs lack standing under the ESA and under the APA because they have asserted no interest in protecting the fairy shrimp and therefore do not fall under the "zone of interests" protected by Congress in passing the ESA. The Court concludes that plaintiffs have standing under both tests.

### A. Article III Standing

■ In order to withstand defendants' and defendant-intervenors' suggestion that they lack standing, plaintiffs must demonstrate that they have suffered "injury in fact," that is, injury "fairly traceable" to the actions of defendants and that the injury will likely be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–561, 112 S.Ct. 2130, 2135–37, 119 L.Ed.2d 351 (1992); *Navegar, Inc. v. United States,* 103 F.3d 994, 997–98 (D.C.Cir.1997). Plaintiffs have provided evidence that the listing of the fairy shrimp has depressed their land values and development prospects, has halted or impeded specific developments, and has already cost them thousands of dollars for sampling surveys as well as the costs of delay. *See* Declaration of Robert Shattuck ¶¶ 5, 7 (Jan. 27, 1996); Declaration of Larry D. Kelley ¶¶ 3–12 (Jan. 27, 1996); Declaration of Randy Schaber ¶¶ 5–9 (Jan. 26, 1996); Affidavit of Robert Ryan ¶¶ 4–6 (Dec. 15, 1995); Declaration of Lorraine Garcy ¶¶ 4–12 (Jan. 11, 1996), Pls.' Opposition to Defs.' Motions for Summary Judgment, Exs. A–E.

■ Defendant-intervenors argue that plaintiffs' injuries are not "fairly traceable" to the listing decision but rather that their injuries will be caused in the future, if at all, by yet-to-be-published regulations promul-gated pursuant to the listing. The Supreme Court has recently made clear, however, that the "fairly traceable" requirement does not mean that plaintiffs must show that the listing was "the very last step in the chain of causation." *Bennett v. Spear,* —— U.S. ——, ——, 117 S.Ct. 1154, 1164, 137 L.Ed.2d 281 (1997). Rather, plaintiffs can meet their burden by demonstrating that the listing had a "determinative or coercive effect on the action of someone else" who, in turn, caused plaintiffs injury. *Id.* In this case, the listing has already had significant effects on the Army Corps of Engineers and the various regulatory entities that govern land use in California, which in turn, as the affidavits and declarations demonstrate, have forced plaintiffs to incur costs and delays. Plaintiffs therefore have standing under Article III to challenge the listing.

### B. Prudential Standing

■ Under the APA and some parts of the ESA, a plaintiff must meet both Article III standing requirements and prudential standing requirements. Prudential standing is a "judicially self-imposed limit[ ] on the exercise of federal jurisdiction," *Bennett v. Spear,* —— U.S. at ——, 117 S.Ct. at 1161, and it "applies unless it is expressly negated." *Id.* at ——, 117 S.Ct. at 1162 (holding that the citizen-suit provision of the ESA, which permits suits by "any person," expands the zone-of-interests for certain claims); *see State of Idaho v. ICC,* 35 F.3d 585, 592 (D.C.Cir.1994). One of the requirements of prudential standing is "that a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." *Bennett v. Spear,* —— U.S. at ——, 117 S.Ct. at 1161 (citing *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984)).

■ Plaintiffs argue that the Supreme Court's recent decision in *Bennett v. Spear* removes any doubt as to their prudential standing. The Court agrees. In *Bennett v. Spear,* the Supreme Court held that irrigation districts that used water from the Klamath Irrigation Project had prudential standing both under the ESA and the APA

to challenge a Biological Opinion issued by the FWS that arguably would have reduced the amount of water available for plaintiffs' use. The Court reversed the Ninth Circuit's decision that the plaintiffs lacked standing because their admittedly economic interests did not fall within the zone of preservationist and environmental interests protected by the ESA.

■ The Court first held that the citizen-suit provision of the ESA, which authorizes suit by "any person," negates the zone-of-interests test altogether because it manifests a clear congressional intent to permit *anyone* to sue, no matter the nature of their interest. *Bennett v. Spear,* —— U.S. at ——, 117 S.Ct. at 1162. In other words, an affected interested business that thinks that the FWS has gone too far in seeking to protect and preserve the environment may be a "person" under the ESA on equal footing with a preservationist or environmentalist who challenges an FWS decision not to preserve or conserve the environment sufficiently.

■ The Court also recognized in *Bennett v. Spear,* however, that not all suits can be brought under the citizen-suit provision of the ESA; suits (such as the instant action) to compel the Secretary to perform his statutory responsibilities under the ESA, for example, are cognizable only under the APA. *Bennett v. Spear,* —— U.S. at ——, 117 S.Ct. at 1167. The Court held that such APA plaintiffs are indeed subject to the zone-of-interests test but that the *Bennett* plaintiffs met the test even though their interests were economic and not environmental. As a general rule, the Court held that

> [w]hether a plaintiff's interest is "arguably ... protected ... by the statute" within the meaning of the zone-of-interests test is to be determined not by reference to the overall purpose of the Act in question (here, species preservation), but by reference to the particular provision of law upon which the plaintiff relies.

*Id.* at ——, 117 S.Ct. at 1167. In other words, a plaintiff's interests need not track the overarching preservationist and environmentally protective purpose of the ESA itself

but need only comport with the more specific particular provision of the ESA being invoked.

The *Bennett* plaintiffs complained that the FWS had not used the best available science as required under 16 U.S.C. § 1536(a)(2). The Court reasoned that the "best scientific and commercial data" provision of the ESA was intended, at least in part, "to avoid needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives," and that plaintiffs' economic interests fell within that zone even though their interests did not follow the general preservationist thrust of the ESA itself. *Bennett v. Spear,* —— U.S. at ——, 117 S.Ct. at 1168. Like the plaintiffs in *Bennett v. Spear,* plaintiffs here have prudential standing to challenge the agency's use of the best scientific and commercial data in listing the fairy shrimp.[6]

■ Even before *Bennett v. Spear,* the D.C. Circuit recognized that a party can meet the prudential standing test by qualifying either as a regulated interest or a protected interest. *Hazardous Waste Treatment Council v. Thomas,* 885 F.2d 918, 922 (D.C.Cir.1989) ("*HWTC*"). The court reasoned that those who are regulated "have the incentive to guard against any administrative attempt to impose a greater burden than that contemplated by Congress," just as environmental groups may serve as watchdogs to assure that the agency fulfills its responsibilities under the law. *Id.* at 922. The party, however, must be "regulated by the particular regulatory action being challenged." *Id.* As the Supreme Court has explained:

> In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiffs' interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. The test is not meant to be especially demanding.

*Clarke v. Securities Industry Assoc.,* 479 U.S. 388, 399, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987).

---

**6.** In view of this conclusion, the Court does not reach the question of whether plaintiffs' claims might have been brought under the citizen-suit

provision, in which case the zone-of-interests test would not apply to them at all. *Bennett v. Spear,* —— U.S. at ——, 117 S.Ct. at 1162.

Defendant-intervenors argue that plaintiffs are not regulated by the listing itself but only will be regulated by its eventual enforcement. They also contend that Congress contemplated imposing on landowners precisely the sort of economic burden complained of by plaintiffs when it passed the ESA because it explicitly decided that listing decisions are not to be made on economic bases. Under this theory, defendant-intervenors maintain, plaintiffs are not challenging an administrative attempt to impose a "greater burden" than that contemplated by Congress, as required by the test laid out in *HWTC*, because the burden of the listing is no "greater" than Congress intended it to be.

■ The Court is not persuaded by this argument. As soon as the fairy shrimp were listed, it became a violation of the ESA to significantly modify fairy shrimp habitat. Section 9 of the ESA makes it unlawful for any person to "take any such [listed endangered] species within the United States or the territorial sea of the United States." 16 U.S.C. § 1538(a)(1)(B). Under the ESA the term "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The term "harm" as used in the ESA's definition of "take" includes significant habitat modification or degradation where it actually kills or injures wildlife. *Babbitt v. Sweet Home Chapter of Communities for Great Oregon*, 515 U.S. 687, 707–09, 115 S.Ct. 2407, 2418, 132 L.Ed.2d 597 (1995). Since plaintiffs are landowners who already have modified, or are in the process of modifying or are about to modify the fairy shrimp's habitat, they are directly regulated by the listing of the fairy shrimp and they therefore have prudential standing under the ESA.[7]

## V. PROCEDURAL CHALLENGES

Plaintiffs challenge the fairy shrimp listing on a variety of procedural grounds. They assert that the FWS did not give sufficient public notice of and opportunity for comment on either its methodology or on the scientific report, the Simovich Study, on which it primarily relied. Plaintiffs also argue that the Simovich Study does not represent the best available science because it sampled only a 200 mile transect of the Central Valley and did not sample the entire state of California or Oregon. Plaintiffs further assert that the listing should be vacated because it was not promulgated within the ESA's statutory deadline and that the original petitions to list the fairy shrimp were fatally deficient because they contained insufficient information.

### A. Notice Under the ESA and the APA

■ An agency need not provide opportunity for notice and comment on all changes made to a proposed rule. A final rule may deviate from the proposed rule if the final rule is a "logical outgrowth" of the proposed rule. *Solite Corp. v. EPA*, 952 F.2d 473, 484–85 (D.C.Cir.1991); *See Omnipoint Corp. v. FCC*, 78 F.3d 620, 631–32 (D.C.Cir.1996); *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 546–47 (D.C.Cir.1983). In determining how much notice is enough, the Court must decide "how well the notice that the agency gave serve[d] the policies underlying the notice requirement." *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d at 547. The three purposes of notice requirements are to ensure that agency regulations are tested by exposure to diverse public comment, to ensure fairness and an opportunity to be heard, and to enhance judicial review. *Id.* These interests are balanced against the public interest in expedition and finality. *Id.*[8]

---

7. The Court also notes that under defendant-intervenors' theory of standing, the plaintiffs in both *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995), and *Endangered Species Comm. v. Babbitt*, 852 F.Supp. 32 (D.D.C. 1994), might well have lacked standing. The Court is unwilling to assume that these plaintiffs merely slipped between the judicial cracks.

8. In *Solite Corp. v. EPA*, the D.C. Circuit upheld a rulemaking in which the EPA relied on data not available for notice and comment in the proposed rule, reasoning that the data was "supplementary," that it "expand[ed] on and confirm[ed] information contained in the proposed rulemaking and addresse[d] alleged deficiencies in the pre-existing data," that the methodology "remained constant and ... the added data was used to check or confirm prior assessments," and that "critical elements of the proposal did not change." *Solite Corp. v. EPA*, 952 F.2d at 484–85. By contrast, where the methodology of a report was widely disputed, Judge Sporkin held

■ Plaintiffs complain that they were not put on notice that the FWS was going to rely on the concept of "vernal pool complexes" rather than "individual vernal pools" in defining fairy shrimp habitat. The Proposed Rule referred to vernal pool complexes several times in describing the habitat of the fairy shrimp, and the Final Rule concluded that based on "[t]he genetic characteristics of the ... fairy shrimp, as well as ecological conditions, ... populations of [fairy shrimp] are defined by pool complexes rather than by individual vernal pools." Final Rule, 59 Fed. Reg. at 48137, 48141. This reliance on complexes effectively reduces the number of fairy shrimp populations, rendering the species more likely to be found to be endangered or threatened, and plaintiffs argue that they were not on notice that this critical determination would be made in this way.

■ The Proposed Rule mentioned vernal pool complexes four times (A.R. at 480, 482, 483, 483), and at least one scientist explained that it is standard practice to assess fairy shrimp habitat in terms of complexes. Letter from Dr. Richard Grosberg (May 18, 1993), A.R. at 258. Indeed, the entire thrust of the Proposed Rule focused on the extent of the fairy shrimp vernal pool habitat, and plaintiffs knew or should have known that the method of assessing population was at issue.[9] While the proposed rule may not explicitly have defined how a particular "complex" was measured or determined, plaintiffs certainly had sufficient notice to enable them to challenge the concept itself. The Court finds that plaintiffs were on notice that the FWS would consider vernal pool complexes as a basis for determining fairy shrimp populations. The Court also con-cludes that the use of this methodology was neither arbitrary nor capricious.[10]

■ Plaintiffs also assert that they were deprived of notice of and the opportunity to comment on the Branchiopod Research Group Study, a key sampling study of fairy shrimp abundance relied on by the FWS in its Final Rule and authored principally by Dr. Marie A. Simovich. Invertebrate Study: 1991–1993: PGT–PG & E Pipeline Expansion Project ("Simovich Study"), A.R. at 2663–2717 (Volume I), 2718–2795 (Volume II), and 3166–3383 (Volume III); see 59 Fed. Reg. at 48141. The study sampled a 200-mile north-south transect in the Sacramento Valley and documented the paucity of fairy shrimp in the sampled area. Simovich Study, Volume II at 6–15, Volume III at 159, A.R. at 2723–40, 3830. While the study itself does not appear to contain explicit conclusions about the threatened or endangered status of the fairy shrimp, the three crustacean biologists who conducted the research for the FWS relied on it, as well as on their own professional expertise, in concluding that fairy shrimp are rare throughout their ranges and recommending that they be listed. See Letter from Marie A. Simovich (July 2, 1992), A.R. at 573–74; Letter from Marie A. Simovich (Sept. 4, 1992) at 3–4, A.R. at 872–73; Letter from Richard C. Brusca (June 16, 1992), A.R. at 527–30; Letter from Jamie L. King at 3 (Sept. 11, 1992), A.R. at 896. The FWS received the Simovich Study during the initial notice and comment period itself and did not subsequently make it available for public comment.

■ Because the Final Rule relies heavily, although not exclusively, on the Simovich Study for the important proposition that

---

that it was error for the agency not to make the report available for notice and comment. *Endangered Species Comm. v. Babbitt*, 852 F.Supp. at 37.

9. Plaintiffs also argue that FWS was arbitrary and capricious because it relied on the "vernal pool complex" model to list the fairy shrimp but on an "individual vernal pool" model in declining to list the California linderiella. Defendants respond that with respect to the linderiella, the FWS did not merely count the number of populated pools but determined more fundamentally that the amount of suitable linderiella habitat was greater than for the other species and that

the linderiella had a more extensive range, based in large part on the Sugnet Report submitted by plaintiffs' experts. Defs.' Opp'n at 10 n. 7.

10. It bears emphasis that plaintiffs offer no evidence that this methodology is flawed in any way; indeed they concede as much and argue only that they were not properly informed of the methodology beforehand. Pls.' Reply at 2 n. 2 ("Superior BIA does not contest FWS's decision that populations of Shrimp are best defined by 'complexes' as opposed to individual pools. We argue, however, that FWS acted arbitrarily by failing to articulate its methodology in applying the 'complex' model.").

fairy shrimp are rare within their ranges, 59 Fed.Reg. at 48141, the study should have been made available for notice and comment. Fundamentally, however, the Final Rule does not turn on the Simovich Study results but rests on a broad constellation of data and factors. Furthermore, even the conclusion that fairy shrimp are rare within their ranges has other support in the record. *Cf. Endangered Species Comm. v. Babbitt*, 852 F.Supp. at 37. Indeed, many experts recommended listing the species without relying on the Simovich Study.[11] The Court concludes that the failure of the FWS to submit the Simovich Study to public notice and comment does not rise to the level of arbitrary and capricious agency action and that its failure to do so therefore does not warrant vacating the Final Rule. *See City of Las Vegas v. Lujan*, 891 F.2d at 935.

The only research identified by plaintiffs that contradicts the Simovich Study is the report prepared by Sugnet & Associates, an environmental consulting firm retained by plaintiffs. *See* Preliminary Compilation of Documented Distribution, Fairy Shrimp and Tadpole Shrimp Proposed for Listing, California 1993 ("Sugnet Report") (Apr. 29, 1993), A.R. at 2849–2888. It is abundantly clear from the record that the FWS gave careful consideration to the Sugnet Report and even relied on some of its data in deciding not to list the linderiella. 59 Fed.Reg. at 48138, 48140–41, 48145–46. *See also* Defendant–Intervenors' Mem. at 32 & n. 22. Furthermore, the Sugnet Report, and its finding that fairy shrimp are more abundant than previously believed, is itself controverted. *See* Letter from Dr. Richard Grosberg (May 18, 1993), A.R. at 258–60. The Court concludes that the FWS's listing decision was sufficiently supported by scientific evidence beyond the Simovich Study and that in reaching its decision the FWS was aware of and gave careful consideration to the only opposing view (the Sugnet Report). The FWS engaged in a sufficiently careful evaluation of the evidence to make it inappropriate

for this Court to vacate the Final Rule on that basis. *See Marsh v. Oregon Natural Resources Council*, 490 U.S. at 377–78, 109 S.Ct. at 1861–62.

▮▮▮ Plaintiffs further attack the FWS's reliance on the Simovich Study under the theory that it does not represent the best available science. The ESA requires the Secretary to make listing determinations "solely on the basis of the best scientific and commercial data available...." 16 U.S.C. § 1533(b)(1)(A). Plaintiffs argue that the Simovich study is not the best available science because it only sampled a 200–mile transect of the Central Valley, because the sampling was not "random," and because it relies on the indeterminate concept of vernal pool complexes. As noted, however, the FWS relied on a great deal of scientific and commercial data in addition to the Simovich Study.[12] Most importantly, plaintiffs have pointed to no data that was omitted from consideration by the FWS. While it would have been advisable for the Simovich Study to have been tested in the crucible of public notice and comment, the FWS appears to have assembled and evaluated all the available data on the fairy shrimp of which the Simovich Study was only one element, albeit an important one. In light of the comprehensive quality of the FWS's data collection, the Court finds that the agency relied on the best available science pursuant to Section 1533(b)(1)(A).

### B. The ESA's Statutory Deadline

▮▮▮ Plaintiffs argue that the listings should be vacated because they were not promulgated within the ESA's statutory deadline. Not only do they offer no authority for this proposition but recent case law is to the contrary. *See Idaho Farm Bureau Federation v. Babbitt*, 58 F.3d 1392, 1399–1401 (9th Cir.1995) (Secretary's failure to list species within 18 months after proposal did not bar listing). Plaintiffs reliance on 16

---

**11.** Letters from Dr. Denton Belk (June 27, 1992 and Aug. 24, 1992), A.R. at 560, 644; Letter from Dr. Robert Holland (Sept. 18, 1992), A.R. at 927–32; Letter from Professor Clyde H. Erickson (July 7, 1992), A.R. at 575; Letter from Dr. Joel W. Martin (Sept. 8, 1992), A.R. at 881; Letter from Dr. Alan E. Launer (Sept. 11, 1992), A.R. at

892; Letter from Dr. Richard Grosberg (May 18, 1993), A.R. at 258–60; Memorandum from the Invertebrate Working Group (Aug. 21, 1992), A.R. at 643.

**12.** *See supra* note 11.

U.S.C. § 1533(b)(6)(B)(ii) is misplaced since this section only applies where the Secretary has found insufficient evidence to list a species.

### C. The Original Petitions to List

 Plaintiffs challenge as fatally deficient the original petitions to list the fairy shrimp, arguing that they contained insufficient information to support the listing. The plain language of the ESA indicates, however, that the Secretary's finding that a petition is warranted is not subject to judicial review. 16 U.S.C. § 1533(b)(3)(C)(ii) states: "Any negative finding described in subparagraph (A) and any finding described in subparagraph (B)(i) or (iii) shall be subject to judicial review." A finding that a petition is warranted is controlled by subparagraph (B)(ii), the subparagraph expressly *left out* of the judicial review provision. Moreover, even if this Court had the authority to review the warranted finding, the standard is a generous one: the Secretary need only determine whether the petition includes "substantial information [which is] that amount of information that would lead a reasonable person to believe that the measure proposed in the petition may be warranted." 50 C.F.R. § 424.14(b).[13] Plaintiffs' challenge on this basis must fail.

### VI. THE SERVICE'S STATUTORY AUTHORITY AND ALLEGED VIOLATION OF ITS OWN POLICIES

#### A. Listing a Distinct Invertebrate Population

16 U.S.C. § 1532(16) permits the listing of a distinct population of a vertebrate species but not of an invertebrate species. Plaintiffs argue that because the FWS listed the fairy shrimp, an invertebrate species, based on the analysis of isolated populations, it has in effect listed a distinct population of an invertebrate species and thereby exceeded its statutory authority under the ESA. To put it another way, plaintiffs argue that the FWS's sampling data is inadequate to prove that each of the four fairy shrimp species is actually endangered. This argument essentially recasts plaintiffs' best available scientific evidence argument that defendants have not properly measured the extent, range and scarcity of the fairy shrimp species. *See supra* at 902–903. Again, plaintiffs point to no evidence that the fairy shrimp in the vernal pools studied by the myriad experts relied on by the FWS represent a distinct population of fairy shrimp or that the four listed fairy shrimp species are not valid species. The FWS did not list a distinct invertebrate population, *cf. Carlton v. Babbitt*, 900 F.Supp. 526, 528–29 (D.D.C.1995), and plaintiffs' challenge on this basis therefore fails.

### B. Did the FWS Violate Its Own Policies?

 Plaintiffs argue that the FWS violated its own internal policy statements with respect to (1) independent peer review, *see* Notice of Policy Statement, 59 Fed.Reg. 34270 (July 1, 1994); (2) using primary and original sources, *see* Notice of Policy Statement, 59 Fed.Reg. 34271 (July 1, 1994); and (3) providing notice regarding the kinds of land use activities that might expose plaintiffs to liability, *see* Notice of Policy Statement, 59 Fed.Reg. 34272 (July 1, 1994). Defendants respond that agency policy statements do not create enforceable rights and that in any event these policies were promulgated or went into effect after the notice and comment period and thus are inapplicable.

> The touchstone for enforceability [of an agency rule or statement] is agency intent.... [T]he binding quality of a particular rule or statement will depend on whether the agency intended to establish a substantive rule, one which is not merely interpretive but which creates or modifies rights that can be enforced against the agency.

*Jackson v. Culinary School of Washington*, 27 F.3d 573, 584 (D.C.Cir.1994). *See also Vietnam Veterans of America v. Secretary of the Navy*, 843 F.2d 528, 536–38 (D.C.Cir. 1988). The APA specifically exempts "general statements of policy" from the requirements of notice and comment, 5 U.S.C. § 553(b)(3)(A), although such statements

---

**13.** 50 C.F.R. § 424.14(b) does not, as plaintiffs assert, require that a petitioner include a narrative or any other specific kind of information in the petition but only that the Secretary consider such elements among others.

must either be published in the federal register or made available for public inspection and copying. 5 U.S.C. §§ 552(a)(1)(D) and (a)(2)(B).

The stated purpose of the FWS peer review policy is to "clarify the role of peer review" under the ESA; it is "intended to complement and not circumvent or supersede the current public review process." 59 Fed. Reg. at 34270. The policy is not an APA promulgated regulation of the sort held to be enforceable against an agency. *Cf. Mine Reclamation Corp. v. FERC*, 30 F.3d 1519, 1524 (D.C.Cir.1994). Rather, the language of the policy resembles the sort of nonbinding policy held unenforceable in *Pacific Gas & Electric Co. v. FPC*, 506 F.2d 33, 38 (D.C.Cir. 1974). *See* KENNETH CULP DAVIS & RICHARD J. PIERCE, ADMINISTRATIVE LAW TREATISE § 6.2 at 228–31 (1994 & Supp.1996). The same is true of the FWS original source policy statement, 59 Fed.Reg. 34271, and the FWS notification policy statement, 59 Fed. Reg. 34272. Both use language reflecting the agency's intention that they be nonbinding.[14]

Even if these policies were binding on the FWS, at least two of them took effect too late to affect the fairy shrimp listing. The peer review policy became effective July 1, 1994, but it primarily governs the management of public comment periods, which, for the fairy shrimp, closed on September 22, 1992. Similarly, the notification policy applies only to species listed after October 1, 1994. The final fairy shrimp listings occurred on September 19, 1994. The FWS's decision to list the fairy shrimp cannot be overturned based on the FWS's alleged noncompliance with its own, nonbinding policy statements.

## VII. FAILURE TO DESIGNATE CRITICAL HABITAT

The ESA instructs that concurrently with listing a species the Secretary of the Interior shall, "to the maximum extent prudent and determinable," designate any habitat of such species "which is then considered to be critical habitat." 16 U.S.C. § 1533(a)(3)(A).[15] The implementing regulations explain in relevant part that "[a] designation of critical habitat is not prudent when ... [t]he species is threatened by taking or other human activity, and identification of critical habitat can be expected to increase the degree of such threat to the species...." 50 C.F.R. § 424.12(a)(1).

In this case, the Secretary explicitly decided that it would not be prudent to designate critical fairy shrimp habitat, citing the fear that "the publication of precise maps and descriptions of critical habitat in the Federal Register would make these species more vulnerable to incidents of vandalism." Final Rule, 59 Fed.Reg. at 48151; *see* Proposed Rule, 57 Fed.Reg. at 19861 (designation of critical habitat "likely would increase the degree of threat from vandalism or other human activities"). Plaintiffs complain that the failure to designate critical habitat violates the ESA and also deprives landowners of the mechanism by which they could bring economic concerns to the Secretary's attention and obtain notice of what kinds of activities may expose them to liability.

---

**14.** Even if the notification policy were binding, it states that "[i]t is the policy of the Service to identify, to the extent known at the time a species is listed, specific activities that will *not* be considered likely to result in violation of section 9 [of the ESA]. To the extent possible, activities that will be considered likely to result in violation also will be identified in as specific a manner as possible." 59 Fed.Reg. at 34272 (emphasis added). In other words, the FWS policy promises no more than to identify some safe activities, not, as plaintiffs would have it, to delineate the full extent of plaintiffs' potential liability.

**15.** The ESA further requires:

A final regulation designating critical habitat of an endangered species or a threatened species shall be published concurrently with the final regulation implementing the determination that such a species is endangered or threatened, unless the Secretary deems that—

(i) it is essential to the conservation of such species that the regulation implementing such determination be promptly published; or

(ii) critical habitat of such species is not then determinable, in which case the Secretary, with respect to the proposed regulation to designate such habitat, may extend the one-year period specified in subparagraph (A) by not more than one additional year, but not later than the close of such additional year the Secretary must publish a final regulation, based on such data as may be available at that time, designating, to the maximum extent prudent, such habitat.

16 U.S.C. § 1533(b)(6)(C).

In support of the decision of the FWS not to designate critical habitat, defendants point to a number of incidents of destruction of habitat documented in the administrative record. A.R. at 190, 263A, 573–74, 591,972, 1011, 1011A, 1012; *see also* A.R. at 1124–29. Only one of these incidents, however, expressly refers to vandalism. *See* Memorandum from FWS Sacramento Field Office (July 3, 1991), A.R. at 1012 (describing "selective destruction" of vernal pools). The other cited sources chronicle generic instances of habitat destruction without discussing the motivation behind the destruction. The mere fact of habitat destruction, however, does not in itself militate against designating critical habitat. Indeed, one of the documents cited by the FWS actually supports the opposite conclusion. *See* Letter from Riverside County Planning Department (July 7, 1992), A.R. at 591–92. This letter describes future developments planned for fairy shrimp habitat, indicating that those developments will continue as scheduled *unless* the fairy shrimp are listed. The FWS has not explained in any way why designating critical habitat would not further protect such habitat already scheduled for development.

The FWS appears to rely on two assumptions, both without any support in the record: first, that owners of critical habitat who learn of the presence of fairy shrimp on their property would increase their developmental pace in direct violation of the ESA, *and*, second (the other side of the coin perhaps), that so long as critical habitat is not designated such landowners would remain unaware of their potential liability and therefore not develop their property apace. The Court finds this reasoning, if it can be called that, attenuated and unsupported by the record. The defendants' asserted reason—vandalism—is not sufficiently substantiated by the single record reference to intentional vandalism in light of the strong presumption that critical habitat will be designated concurrently with the listing of a species. *Northern Spotted Owl v. Lujan*, 758 F.Supp.

621, 626 (W.D.Wash.1991); *cf. Fund for Animals v. Babbitt*, 903 F.Supp. 96, 115–17 (D.D.C.1995) (upholding Secretary's decision to deny a petition to designate critical habitat). The case therefore shall be remanded to the FWS for the limited purpose of clarifying or reconsidering this portion of the Secretary's decision. On remand, the Secretary must either initiate the process of designating critical habitat or provide adequate record support and reasoned explanation for the determination that such a designation is not prudent. This limited remand should not be interpreted as affecting the validity of the listing itself.[16]

## VIII. THE COMMERCE CLAUSE AND THE TENTH AMENDMENT

Plaintiffs and amici argue that the final listing of the fairy shrimp (although not the ESA itself) exceeds the federal commerce clause power and violates the Tenth Amendment because there is no nexus between the fairy shrimp and interstate commerce and because the listing interferes with state and local sovereignty over land use. Specifically, they argue that this listing cannot stand in view of the Supreme Court's recent interpretation of the Commerce Clause in *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), because the fairy shrimp do not "substantially affect" interstate commerce. *See United States v. Olin Corp.*, 927 F.Supp. 1502 (S.D.Ala.1996) (interpreting *Lopez* as invalidating an application of CERCLA requiring the clean-up of a 20–acre solid waste management site because the pollution at that site did not affect interstate commerce).

The Court in *Lopez* struck down the Gun–Free School Zones Act, 18 U.S.C. § 922(q), which made it a federal offense to possess a firearm in a school zone, reasoning that

Section 922(q) is a criminal statute that by its terms has nothing to do with "commerce" or any sort of economic enterprise,

16. In light of this result, the Court does not reach plaintiffs' argument that the failure to designate critical habitat and the FWS's failure to follow its own policy of apprising landowners of what activities might trigger liability violate plaintiffs' right to due process. Pls.' Reply at 29. The Court notes, however, that since plaintiffs participated fully in the notice and comment process leading to the Final Rule and since they also assert that they have already taken costly steps to comply with the listing and draft guidelines, the argument underlying their due process claims that they have not been properly put on notice is unavailing.

however broadly one might define those terms. Section 922(q) itself is not an essential part of a larger regulation of economic activity, in which the regulatory scheme would be undercut unless the intrastate activity were regulated.

*United States v. Lopez*, 514 U.S. at 561, 115 S.Ct. at 1630–31. The Court also invalidated Section 922(q) because it criminalized mere possession and "contain[ed] no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Id.* at 561, 115 S.Ct. at 1631.

In contrast to the statutory provision at issue in *Lopez*, the ESA directly and expressly regulates the import, export and sale of listed species in interstate commerce. 16 U.S.C. §§ 1538(a)(2)(A), (C), (D).[17] At the time of its passage, "the Endangered Species Act of 1973 represented the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 180, 98 S.Ct. 2279, 2294, 57 L.Ed.2d 117 (1978). The Supreme Court described Congress's extraordinarily broad intent when passing the ESA:

> The legislative proceedings in 1973 are ... replete with expressions of concern over the risk that might lie in the loss of any endangered species. Typifying these sentiments is the Report of the House Committee on Merchant Marine and Fisheries [stating]: ".... *The value of this genetic heritage is, quite literally, incalculable* .... From the most narrow possible point of view, *it is in the best interests of mankind to minimize the losses of genetic variations.*"

*Id.* at 177–78, 98 S.Ct. at 2293 (quoting H.R.REP. No. 93–412, pp. 4–5 (1973)) (emphasis in opinion). It would be hard to imagine a stronger expression of Congress's belief that species preservation substantially affects the national economic interest.

Several courts have upheld the ESA against similar commerce clause challenges, including one judge of this court. In *National Ass'n of Home Builders v. Babbit*, 949 F.Supp. 1 (D.D.C.1996) (Urbina, J.), the court concluded that notwithstanding *Lopez*, "Congress has the constitutional power to protect wildlife," even where the endangered species at issue, the Delhi Sands Flower-loving Fly, was endemic to California and therefore in some sense was not "interstate" in character. *Id.* at 5–8. Similarly, the Ninth Circuit upheld the Eagle Protection Act, 16 U.S.C. § 668, against a commerce clause challenge, reasoning that "[e]xtinction of the eagle would substantially affect interstate commerce by foreclosing any possibility of several types of commercial activity." *United States v. Bramble*, 103 F.3d 1475, 1481 (9th Cir.1996).

The Ninth Circuit in *Bramble* also reaffirmed the reasoning of the pre–*Lopez* decision in *Palila v. Hawaii Department of Land and Natural Resources*, 471 F.Supp. 985, 994–95 (D.Hawai'i 1979), *aff'd* 639 F.2d 495 (9th Cir.1981). *See United States v. Bramble*, 103 F.3d at 1481 (quoting *Palila* with approval). In *Palila*, the court held that the listing under the Endangered Species Act of the Palila, a bird endemic only to Hawaii, did not exceed Congress's commerce clause power or violate the Tenth Amendment. The court noted that "Congress has determined that protection of endangered species anywhere is of the utmost importance to mankind ... [and that] a national program to protect and improve the natural habitats of endangered species preserves the possibilities of interstate commerce in these species and of interstate movement of persons ... who come to a state to observe and study these species." *Id.* at 994–95. *See also Hoffman Homes, Inc. v. EPA*, 999 F.2d 256, 261 (7th Cir.1993) (acknowledging that Congress could, under its commerce clause power, regulate wetlands that might have an impact on migratory birds). For the same reasons, the application of the ESA to the fairy shrimp is within Congress's commerce clause power.

Plaintiffs' position is untenable for two additional reasons. First, plaintiffs would have the Court invalidate the listing as an imper-

---

**17.** Defendants have provided declarations of at least one out-of-state expert who has bought or sold fairy shrimp specimens (before they were listed) and who has traveled to California to study them. *See* Declaration of Denton Belk ¶¶ 1, 2, 4, 5 (Jan. 31, 1996), Defs.' Response to Pls.' Motion for Summary Judgment.

missible exercise of congressional power because it regulates only intrastate activity. Plaintiffs assume for the purposes of this argument that the fairy shrimp exist only in California and therefore that their preservation (or extinction) does not implicate Congress's interstate powers. Plaintiffs' challenge to the rationality of the listing itself under the APA, however, rests heavily on the assertion that fairy shrimp are more widely found than the FWS admits, and in particular, that their habitat stretches from Oregon to Mexico. *See* Pls.' Mem. in Support of Motion at 33 & n. 22. In effect, plaintiffs concede that the actual extent of the fairy shrimp habitat may be less than certain. While plaintiffs are, of course, entitled to argue in the alternative, such factual uncertainty provides a shaky foundation for a constitutional challenge to a heartland application of the Endangered Species Act.

Second, although plaintiffs purport to levy merely an as-applied challenge to the ESA, their argument, if accepted, would undermine the Act's central purpose across the board. According to plaintiffs, if a species is abundant and scattered plentifully across state lines, Congress is fully empowered under the Commerce Clause to protect it. But when that same species becomes more scarce and its population reduced to a single state, Congress's hands are suddenly tied. The Court declines to read *Lopez* as hamstringing Congress in such an irrational fashion in a regulatory area of such important economic, scientific and environmental dimensions.

An Order consistent with this Opinion shall be entered this same day.

SO ORDERED.

### *ORDER AND JUDGMENT*

This case is before the Court on plaintiffs' motion for summary judgment, defendants' motion for summary judgment and defendant-intervenors' motion for summary judgment. Having carefully considered the filings of all the parties as well as amici, the arguments of counsel and the entire record in this case, and for the reasons stated in the accompanying Opinion issued this same day, it is hereby

ORDERED that plaintiffs' motion for summary judgment is GRANTED in part and DENIED in part. The Court finds defendants' decision not to designate critical habitat for the fairy shrimp to be arbitrary and capricious and not supported by the administrative record. Accordingly, that portion of the Secretary's decision is REMANDED to the Fish and Wildlife Service. The FWS shall file a Report with the Court on or before September 25, 1997, in which it shall either inform the Court that critical habitat has or will be designated, provide record support for the determination that the designation of critical habitat is not prudent, or provide the Court with a date certain by which one of these alternatives shall be accomplished. All other aspects of the Secretary's decision are upheld; it is

FURTHER ORDERED that defendants' motion for summary judgment is GRANTED in part and DENIED in part. With respect to all aspects of the Secretary's decision except the decision not to designate critical habitat, JUDGMENT is entered for defendants; and it is

FURTHER ORDERED that defendant-intervenors' motion for summary judgment is GRANTED in part and DENIED in part. With respect to all aspects of the Secretary's decision except the decision not to designate critical habitat, JUDGMENT is entered for defendant-intervenors.

SO ORDERED.